The first case for argument this morning is 18-2015, Deosan Biochemical v. United States. Mr. Pat, good morning. Thank you, Chief Judge Prost. May it please the Court, Commerce now insists that the main reason it applied adverse facts available is that Doosan failed to produce the export service agreement between AHA and Doosan until after the preliminary determination, but Doosan and AHA disclosed the material terms of that relationship well before the preliminary determination, and based on the information that they had provided, Commerce had already determined that Doosan, not AHA, was the exporter for purposes of Doosan's U.S. sales. What do you say based on the information they provided? Are we talking about the ESA? We're talking about the responses to the questionnaire, Your Honor, which disclosed the material terms of the ESA, and let me draw your attention to the joint appendix at 116, and this is from the preliminary determination of Commerce in the first administrative review, and what page are you directing us to? 116 of the joint appendix, Your Honor, and this is from July 31st, 2015, so well before any of these issues came up. Can I just step in? I'm sorry to take your time, but this is the weird thing about appendices. I know people try to cramp them in, and so they only do the right page, but since we've only got a couple of pages, can you tell us what this is? This is from the preliminary determination, Your Honor, from July 2015, and what Commerce said at that time is Doosan is the exporter for sales originally attributed to AHA. Specifically, we preliminarily find that Doosan is responsible for negotiating and setting the terms of sale and directing the activity of AHA with regard to subject merchandise. That is from July of 2015, before Commerce ever delayed the proceeding to investigate that relationship. I'd also like to direct the Court to page 19 of the government's brief. What you'll see there is that So, I'm sorry, is the point you're making with respect to this sentence, the government knew early on and could discern from the responses what the relationship was? Exactly right. And then, if you look at the government's brief on page 19, they assert that the actual relationship between Doosan and USA is what they say is a far cry from the descriptions that were provided to Commerce in their respective questionnaire responses. And then they say, indeed, Doosan and AHA have since acknowledged that AHA played no role in determining the customer or the terms of sale, and they cite to the appendix at page 69 to 72. The appendix, page 69 to 72, Your Honor, is You're going so fast, I'm sorry. I have no idea what you just read from in the red brief. I'm paging through the red brief. I can't find the word indeed. I don't know. Certainly. Certainly, Your Honor, I'm sorry. On page 19 of the red brief, if you look at the first complete paragraph, this is the government's argument that the relationship between AHA and Doosan was not properly disclosed in the preliminary phase of the investigation. And the government asserts in the middle of that paragraph, indeed, Doosan and AHA have since acknowledged that AHA played no role in determining the customer or the terms of sale. And you'll see that the government cites there to the appendix at pages 69 to 72. And that is indeed the response explaining that AHA did not have a role in choosing the customers or terms of sale. The problem for the government is that response is from October 2014. This is AHA's initial response to the government's questionnaire explaining the nature of the relationship between AHA and Doosan. It is not some submission from later where there's an acknowledgment of an inconsistency. AHA and Doosan have been 100% consistent and fully disclosing the nature of this relationship. Well, what about appendix 9? This is the Court of International Trade opinion. Yes, Your Honor. There's a footnote 4 which says, indeed, plaintiffs appear to concede that the ESA agreements were requested by commerce in the original questionnaire, suggesting that the withholding of the document was the result of an accidental omission. Bottom line is that they recognize that the ESA should have appropriately been included as the response? No? Your Honor? You're shaking your head, so I'm assuming you disagree. Right. I don't think that that's an accurate characterization of what the representation was. But I said what they said in the footnote. Correct. But I don't think that the district court's characterization was accurate in terms of, I think, Doosan always took the position that they understood that question not to call for the ESA, rather to call for sales agreements that were generated in the train of sale for a sample sale. That's the wording of the question. But I really want to emphasize that. Yeah, but even, who cares what they thought? If the court made a, you're telling me now what they thought. But if the court made a fact finding to the contrary, I review that for deference. I mean, that language of the request, it seems to me they're asking for the ESAs. You're telling me my client didn't understand that. But who cares, given the standard of review? Your Honor, first of all, the review's de novo. But second of all, the point here is that whether or not the ESA was called for doesn't matter because there's no material difference between the ESA and the disclosure that was made. Yeah, but your earlier argument doesn't work for me because you say, well, the government knew at an earlier time there was a problem. But didn't the government then delay the proceedings precisely to investigate the relationship between AHA and Doosan? And what they determined was that what Doosan and AHA had said all along was exactly correct. There was no difference between the relationship. There was no material difference between the relationship that was disclosed. That is that Doosan and Doosan USA were negotiating the sales price. AHA was receiving a commission on sales. That's exactly what AHA said in the first disclosure, the first questionnaire response. That's exactly what Doosan said in its first questionnaire response. There was no difference. The statement that there was a material difference between what was disclosed in the preliminary investigation and what was disclosed by the ESA is not supported by substantial evidence. Let me point you to another example, Your Honor. If you look at the government's brief at page 18, the red brief at page 18, the government points out, again, the government is trying to justify the statement that it only understood the nature of the relationship after the ESA was received. And the government points out, again, in the middle paragraph, it says that in the administrative review, Doosan had said that it was not privy to the And the government points out, well, but AHA was considered a reseller, and so that wasn't accurate. The problem with that argument is that, again, in the very same response to which the government cites, if you look, Your Honor, Correct. That's what the government cites to. But, Your Honor, I have too much paper here, Your Honor, but if the government looks at page I have too much paper up here, too. Yes. If the government looks at pages 666 and 667 of the Joint Appendix, that is the same questionnaire response. Okay, that's the same submission from March of 2015 by Doosan. And that's exactly where Doosan says, here's exactly how we arrange sales by Doosan USA. Here's exactly the role that AHA plays. Doosan USA is setting the price, or Doosan China is setting the price in cases of sales where Doosan USA is not the importer. And AHA gets a commission. That's exactly what it says. Look at page 172 of the appendix where there is a detailed discussion about differences between Doosan's responses and what later came to be established through the ESAs. And the first full paragraph on 172, which the government cites, as how the appellant's withholding of the ESAs impeded the investigation and resulted in inconsistent statements. Right. This is about whether or not they have knowledge of customer lists or sales calls with resellers. They said one thing up front, but then they said, oh, well, we consider AHA a reseller. And then they do have information about all that stuff, it turns out. Right. So that was the example. The reseller example is the one that is cited in the brief at page 18. And as I say, in that response to which they cite, they cite to, in the appendix, it's page 674 to 675. That's the same response to which they were citing in the JA at 172. And that is the same questionnaire response in which Doosan makes absolutely 100% explicit the role that AHA is playing in the sales that Doosan is making through AHA. That's at page, again, that's at page 666. Clarify again, 172, what is this document I'm reading? 172 is the post-preliminary determination, Your Honor. It's when, so what happens is that after the preliminary determination, there are comments. C.P. Kelko puts in a comment and says, there are anomalies and discrepancies in Doosan and AHA's responses. And Commerce says, okay, we need to look at that. We're going to take a little time. And they delay it in February. But I'm confused because Doosan responded that it does, it's not privy to ultimate customers or markets for the subject merchandise sold by resellers. Correct. It doesn't provide customer lists or make joint sales calls with resellers. But then later they supplemented that they do consider AHA a reseller and they do have knowledge of the customers' sales. Correct. But, Your Honor, so because Doosan was... that inconsistent statements were made that weren't clarified until later when the ESAs were provided. For two reasons. Why isn't that reasonable for the government to see it that way? For two reasons. One is that the response to which they're citing is part of the same questionnaire response in which they described how sales were made through AHA. So it was clear from context that when they were talking about resellers, they were talking about resellers other than AHA. That is, customers who might have purchased the goods in the United States and then resold them. Okay? But the second reason is that in May, six weeks later, May 2015, not in the post-preliminary investigation, in May of 2015, Commerce asks about this and says, where, you know, where did you provide, where did you provide the, you know, I don't understand how you square your description of AHA with your statement about the resellers. And so Doosan explained it. And that's in May 8, 2015. It's JA 1437. Again, this is well before the preliminary determination and then this investigation. So there is no evidence to support the claim that there was any material information that was lacking or withheld. It's just not true. And then the second basis that the government relied on below, and in fact the primary one below, which Commerce seems not really to want to defend, is that there was something tainted about the prices. Your Honor, I see I'm running very short on time. But what I want to emphasize about the issue with the prices is there was nothing, once it was correctly determined, that Doosan USA was the seller, the first unaffiliated sale, was the sale to, in the U.S., from Doosan USA to the ultimate customer, not a sale from AHA to Doosan USA. Commerce was using the right numbers, and they've never explained why they weren't using the right numbers. Remember, the purpose of determining the dumping margin is to take the U.S. sales price and compare it to the normal price. No one argues, nor could they argue, that the ESA had any impact on the calculation of the normal value. No one argues, nor could they argue, that the ESA had any impact on the export price or the constructed export price. Indeed, no one's saying there's anything wrong with the normal value, okay? And there is no coherent argument, and commerce hasn't offered you one, that the cash deposit rate paid by Doosan USA had any impact on the export price or the constructed export price. And moreover, commerce confirmed that Doosan is entitled to a separate rate, the imposition of 154% dumping margin rather than the 5% that was calculated in the preliminary investigation, is punitive and unlawful. And I'll reserve my remaining seconds. Thank you. May it please the Court. I'd like to pick up on one of the points that we were just talking about, whether Doosan considered AHA to be a reseller, because I think it's instructive as to how confusing this process had actually gotten by the time commerce decided to defer its final determination. So in March 2015, as my opposing counsel said, Doosan says that it's not privy to reseller information. Then in May 2015, it says it considers AHA to be a reseller. Then in April 2016, it says there's some confusion, AHA actually is not a reseller, AHA is our principal agent. We are the principal, AHA is the agent. Well, they gave the copy of the ESA right before that. Correct. So they go from trying to portray AHA as a mere reseller, over which Doosan has no control or no knowledge, to at the very end of the proceeding, admitting that AHA is actually its agent, who has absolutely no control to do anything but to sell Doosan's products at the price at which Doosan arranges prior to sale. Can you go to the first appendix site that Mr. Panner gave us, which is 116 of the appendix. This is the preliminary determination he said in 2015 and that second full paragraph talks about their decision to treat Doosan rather than AHA as a mandatory respondent because they realized something was going on in this relationship. So how does that not indicate that they had some knowledge not specifically about the ESA but about the relationship going on? Commerce was certainly trying to figure out what was going on. It first sends its questionnaire to AHA and AHA says, actually no, it's not us. We don't set the prices. It's the other party. So then they send the questionnaire to Doosan. Doosan suggests but is in a confusing way that it negotiates the prices but it negotiates them with AHA. So then Commerce, trying to satisfy its statutory deadlines, issues this preliminary determination essentially saying, okay, we think what's going on is that Doosan is the proper respondent here and so we're going to use their numbers. Now what I think is missing from the article that was articulated by my opposing counsel is that after this happened and the parties filed their administrative case briefs, the petitioner alerts Commerce to the fact that there is a separate proceeding going on or has just been completed a separate proceeding to try to determine what's going on with these two party sales. Because of course prior to this administrative review Doosan had exported almost all of its sales and AHA, it didn't really use AHA as much. And now all of a sudden it's only using AHA. So Commerce initiates a change or tries to determine whether a changed circumstance review is appropriate. That's a totally separate proceeding. The petitioner alerts Commerce to the fact that this separate proceeding has gone on and alerts Commerce to the vast inconsistencies between the statements that Doosan is giving in the changed circumstances review proceeding and the answers that it's giving in this proceeding. And that's really the genesis of the confusion. So Commerce in its prelim that Your Honor is citing to on page 116, Commerce thinks it knows what's going on. But then it figures out it actually doesn't know what's going on. Because the answers that Doosan has given in the changed circumstances review are vastly different from the answers that it's giving here. So that's why it takes a step back and takes more time which is a truly unprecedented thing for Commerce to do. I've actually never seen Commerce do something like defer its final results for this kind of a situation. Obviously it's a statutory deadline that Commerce adheres to religiously. This is a really unusual thing for Commerce to have done because it determined that there was potential fraud in the proceeding. So you're suggesting the delay was did they express why they were making the delay? Or your suggestion is that the delay was because they were met with such confusion in the responses etc. that they couldn't really figure out? So Commerce did express why it decided to defer the results. I think though that the better memo is in the record, but I think the better explanation of it is in the final results where Commerce says on page 198 of the Joint Appendix While Dosen and AHH challenge, this is at the very bottom, the department's legal authority to collect and use factual information after the statutory deadline. This court has recognized a small number of exceptions when we allow supplementation of an agency record including where evidence was tainted by fraud and calls into question the integrity of the agency's proceedings. We have determined that this review is such an exception. Well, isn't it also correct that in the supplemental questionnaire Congress requested all documents, contracts, arrangements, and agreements between Dosen and AHH and they were just completely not provided in response to that? It wasn't so much later. They just kept not giving Commerce documentation that was expressly asked for that was directly relevant to this point. Yes, absolutely. So there are two parts to Commerce's final determination. That would make me suspicious, right? If I keep getting answers from you, but you won't give me the underlying documents that will clearly establish it, its reason seems to me to justify being concerned about the veracity of the statements. So Commerce says there are two parts to its determination. One that Dosen was impeding the review and one that it was withholding evidence. Now, this is a sort of unusual situation where Commerce didn't actually know that there was an agreement. So it didn't know that Dosen was withholding the agreement because how could it possibly know that there was this kind of agreement until it kept pressing and pressing and then it realized if this truly is a principal agent arrangement, there probably is some kind of agreement. And then later on after the deferral, Commerce starts asking more specific questions. Is there an agreement between you? Please give it to us. But even if the court didn't think that that was enough, you know, the original request that Commerce gave is describe your agreement for sales, provide a copy of each type of agreement. Ms. Burke, let me ask you a question if I could, please. As I read the decision below, both the agreement and the Court of National Trade decision, Commerce seemed to have two problems. One, what you've been talking about and what Mr. Panner, the majority of his time, talking about, not furnishing the ESA, the two ESAs. Then there seemed to be a suggestion in the record that in addition to failure to timely present the ESAs, Commerce had some kind of a problem with the nature of the agreement that was spelled out in the ESAs. The question I have for you is, supposing the facts were different and right off the bat in 2014, 2015, Dosen had come forward and said, okay, here's the nature of our agreement, here's the way it works, and here are the two ESAs that are in place. Would we be here today if that had taken place? What I'm trying to do is separate out concerns about the nature of the agreement from the alleged untimely improper nondisclosures. Right, so if Dosen had said from the very get-go, it would have to be from even before Commerce chose its mandatory respondent, it would have to be at the very beginning of the proceeding if Dosen had said, this is our arrangement, AHA actually isn't the proper respondent, it's us. I think we might have a different case. However, and I wouldn't want to speculate as to what Commerce would do, but even in that scenario, you have a situation where the parties are clearly not using the correct cash deposit rate. But didn't you have a situation where you had these two, I thought early on there was this document that said there are two possible rates here, the Dosen-Dosen rate and the Dosen-AHA-Dosen-USA rate. And what if they just come in and said, you know, here we have these two rates positive, for business reasons it makes sense for us to go with the Dosen-AHA-Dosen-USA rate, hence we're going with that, here's why, and here's the document that reflects our procedure. What would have been wrong if that had taken place right off the bat? I think even the appellant would concede that according to Commerce's own guidance, that is unlawful. So that's a separate question of whether they're impeding the proceeding. That's what I'm saying, separating that from impeding the proceeding. Commerce has said that the proper rate depends upon the identity of the seller. Where the cash deposit rate is not the cash deposit rate of the seller, the price discriminator, and this is a quote, it is not the proper cash deposit rate required at the time of entry. So in your hypothetical, Dosen has used the wrong cash deposit rate. So the question is, isn't that per se impeding the proceeding by starting out on the wrong foot? They wouldn't be impeding the proceeding though, because they would be saying, here's what we're doing. It's like, you know, you file for a tax refund, and you lay out all the facts, you don't hide anything. The IRS comes back and said okay, you know, we disagree with you. They don't go after you for tax evasion, they go after you and say you owe us more money. What I'm saying is that would, in my mind at least, not be a situation of impeding any investigation. They would be saying here's what we're doing, here's why we're doing it, and here are the supporting documents. How would that be impeding the investigation? I think hypothetically it could be that it's not impeding the investigation, and they would have to do it, like I said, they would have to do it before Commerce even decides who the mandatory respondent is. Because of course, the whole point of this proceeding is for Commerce to look at the sales, try to figure out who has the most sales, and choose those parties to individually review. So, Dosen would have to come in before that process even starts and say, don't look... Before Commerce has even analyzed any of the information and sent any questionnaires out to anybody to try to figure out who the proper respondent is, Dosen would have to come in way before that and explain what's going on. And it's true, maybe that highlight the fact that they've structured their sales in a way that's completely contrary to Commerce's task here, which is to try to figure out who the price discriminator is, to try to figure out what the real United States price is. For these reasons, we respectfully request that the Court affirm the trial court's judgment. Thank you, Your Honor. I really, I think that Judge Schall, your hypothetical is what happened in this case. If you look at the Joint Appendix, if you look at the sites that we have to the Joint Appendix, the nature of the relationship between Dosen and AHA was immediately disclosed by AHA and then Dosen in their responses to the initial questionnaire. For that reason, Commerce never looked at the wrong prices or the wrong data. They looked at the correct sales prices, and they determined the margin. Your Honor, I did want to get back on one quick question. You pointed out that the Court of International Trade said that we had acknowledged not providing something. In fact, there was a mistaken question that was left blank. That was an oversight, and we said that it had been an oversight to leave that blank. That was post-preliminary. As to the production of the ESA with the government, when they read the question, what they leave out is that the question was for the sales documentation with respect to a sample sale. The question, again, it goes to... You can read that question. I looked at that question a number of times, and it seems to be saying you can fairly read it, which is the way I think perhaps Commerce and the Court did, is saying, all right, give us a sample agreement of your arrangement and provide us sales data for a particular sample transaction under that agreement. Right. I mean, it's not... We certainly aren't resting on the idea that no one could possibly read the question that way. What I'm trying to get at is that if you look at the ESA, the claim is... And remember, it's Chenery. You've got to look at what they said. They are claiming there's a difference, that there's a material difference between the ESA that's conventionally provided and what we told them. That is not true. I can't say it strongly enough. AHA and DOCENT revealed the terms of their relationship, exactly the terms. They said that DOCENT sets the prices, AHA takes a 2% commission, that's it. And whether it's sold to DOCENT USA customers, or whether it's sold to an importer other than DOCENT USA, DOCENT sets the prices and AHA gets a 2% commission. That is the... Let me ask you just one question. So over the moment you had a situation where the transaction is accurately described in all respects, which is what you would say was the case here, and Commerce comes and asks for an agreement, and the respondent doesn't provide it, intentionally hides it, and then years down the road it comes to light. Would you say Commerce could proceed as it did here, even though the agreement perfectly dovetailed with the transaction? In other words, what I'm trying to get to is if Commerce asks for something, isn't it entitled to get it, even if there's no disconnect between the stated agreement and the document? Right. So first of all, I would say that Commerce could not, in that circumstance, apply it. Even if there was intentional non-disclosure? Yes, but that's... Let me explain why that's not this case. Oh, I know that's not this... But I'm saying, assuming there was the deal is accurately described, but there's intentional non-disclosure of the contractual document. And let me... The reason why not is that 1677A depends... Excuse me. 1677E depends... which refers to the... which provides for facts available, deals with a situation where information is missing from the record. And so what Congress said, and this is spelled out in the Nippon-Steele decision, the 337F3rd decision, what Congress said was, if you don't have information for any of these reasons, then you can use facts that are otherwise available. But if you have all the information and it's found out that there's some information that you asked for that you didn't have, or there's some document that you asked for, and you don't have it, but you weren't missing any information, there's no basis for applying facts otherwise available. And nobody disagrees that you have to have facts available before you get to adverse facts available. But the reason why that you're hypothetical I think is useful is that if you're trying to think about, okay, why was the ESA not provided? Well, one possibility is they didn't think it was called for. Another possibility is they were trying to hide something. Okay. Well, if they were trying to hide something, then when it was produced, one would discover what was hidden. And there was nothing hidden. Again, the... Well, the Commerce used this as, even if I accept that you're correct, that they were forthright, ultimately with Commerce, they weren't forthright with Customs because they paid the lower rate. So they weren't forthright from the beginning. That was not a question of being not forthright. They had advice of counsel that said that in a circumstance where Dosen is the producer and AHA is the exporter, that they should pay the lower rate. In any event, it's not material. That's an issue for Customs. Customs finds out about it, and indeed during the preliminary phase, Commerce knew that this had been referred to Customs. They were already aware that Customs was looking into this issue, and indeed Customs did ultimately tell Dosen, you should stop using the Dosen-AHA case. You should use the Dosen-Dosen case. This is just a deposit anyway. Okay? This is not the dumping duty. This is the deposit. And ultimately, Commerce needs to determine the dumping margin so that the proper dumping margin is imposed. In the preliminary phase, they determined that was 5%. In the second — in the third phase after this was over, they determined it was 9%. They imposed 154% dumping margin because for reasons that they give in the order that you can read, and they aren't defending those, they said that we were misleading. We weren't. They don't claim we were. They say that this tainted the prices. They didn't. They don't claim they did. Or if they do, it's completely incoherent. We provided absolutely 100% correct, accurate information in the preliminary phase of this investigation and Commerce even drew the correct conclusion which they reaffirmed later, which was that these were Dosen-USA sales. I'm grateful for the extra time. Thank you, Your Honor.